## FERRIE *vs.* THE PUBLIC ADMINISTRATOR.

### *In the matter of the Estate of* JEANNE DU LUX, *deceased.*

THE recent act of the Legislature of the State of New York authorizing " illegitimate children, in default of lawful issue, to inherit real and personal property from their mother as if legitimate," did not affect any right or title vested at the date of the passage of the act in the lawful heirs or next of kin of any person theretofore deceased. This act does not in terms disturb the usual course of a grant of administration ; but if the descent of the illegitimate claimant in default of lawful issue, be proved satisfactorily, it may be proper in the exercise of a sound discretion to make the grant; while on the other hand, if the proofs are not clear, prudence may require the intervention of the Public Administrator, or some other disinterested person, to insure a just scrutiny and the protection of the rights of third parties.

On the decease of an intestate, title to his goods can be made only through the medium of an administrator ; and the next of kin have no legal title to the assets ; but they have a vested interest in the surplus of the estate, after the payment of the debts, which cannot be taken away by legislative act. The statute of distributions may be changed prospectively, but not retrospectively without disturbing vested rights.

Statutes must be construed prospectively, unless there are very express words giving them a retrospective application.

The Court will not depart from the usual method of issuing commissions to take testimony in foreign countries, unless important advantages to be gained by some other mode are shown.

The French Consul is entitled, both by treaty and comity, to be heard in this Court, not as a party, but informally as the national agent of parties supposed to be interested.

CHASE & BALL,
ROBERT H. SHERWOOD,
PATTERSON & EASTMAN, *for Claimant.*

I. The evidence shows that Ferrié is next of kin and legitimate, and therefore entitled *now* to letters of administration.

On the former hearing, the Court was satisfied that Ferrié was the son of Madame Du Lux, and that the evidence on the

whole sustained the legal presumption of legitimacy, yet declined to grant letters as prayed for, but expressed an intention to issue a commission to take further testimony in France.

We submit that this intention ought to be re-considered, and that under the changed aspects of the case as disclosed at the present hearing, the Court ought to grant the letters forthwith, without sending out a commission at all.

It is to be borne in mind, that upon the original evidence Ferrié was *entitled* to letters as asked for by him.

The delay of the grant, and the proposition for a commission are favors to possible unknown successors to the personalty, to be discovered in a foreign land.

II. The changed circumstances which in our judgment make the delay improper, and the duty of immediately granting the letters imperative, are these :

1. The Legislature of New York since the former hearing have enacted the following law, " to take effect immediately." " Illegitimate children, in default of lawful issue, may inherit real and personal property from their mother as if legitimate; but nothing in this act shall affect any right or title in or to any real or personal property already vested in the lawful heirs of any person heretofore deceased."

2. Upon the present hearing, four French claimants appear, but make no suggestion and offer no evidence of the pretended illegitimacy of Ferrié. The proceedings are notorious in France, and still no such evidence is suggested to exist.

3. A letter from another French claimant, a relative of Du Lux the husband of the deceased, offers to Ferrié incontestable evidence of his title to the entire succession, *i. e.* of his legitimacy, for the moderate compensation of one half of the estate.

4. The legislative act shows that the policy of excluding illegitimates from succession to the personalty of mothers, which existed at the time the Surrogate suggested the commission, has been abandoned : the other two facts strengthen the conclusion that Ferrié is, in fact, legitimate.

III. If this were the original hearing, we cannot doubt, that under these circumstances, letters would be unhesitatingly granted to Ferrié. We submit that, as no commission has yet issued, it is the duty of the Court to decline issuing it, but to grant letters to Ferrié as he asks. Justice, equity, sound policy, and the proofs made, seem to require this.

1. Ferrié is the undoubted son of the deceased, whose legitimacy is presumed by law and supported by evidence: for him and not for the remote relatives in France did the deceased toil, save and hoard for so many long years. To him she expected and desired that her accumulations should go,— to him, for whom she manifested a wayward, indeed, but the long enduring affection of a mother.

2. The remote relations are entitled to nothing in equity, or common justice. They have contributed nothing to the acquisition of the property, and had no claim of any sort upon the deceased. Their right, if any, is a naked, cold, legal right, to the assertion of which the Court should volunteer no aid. The only possible effect of a commission, beyond the legal effect of the present evidence which entitles Ferrié to letters, is to enable these remote relatives who never sought or befriended Madame Du Lux when living, to disappoint her expectations when dead, and to invite them to enrich themselves by degrading her and her son.

3. These remote relations are aliens, and have no right to be heard except from comity: and it is not the duty of the Court to be astute in providing means for the assertion of bare and merely possible legal rights of aliens against the present legal title, and plain, equitable and moral rights of citizens. (See *Peters* vs. *Pub. Adm.*, 1 *Brad.*, 202.)

4. Ferrié is a citizen of Ohio. Madame Du Lux was a citizen of New York. If their citizenship were reversed, and Ferrié, a citizen of New York, had applied in Ohio for letters of administration upon the personalty of his mother, a citizen of Ohio, they would have been granted without hesitation: for the laws of Ohio and of sixteen other States allow the succession of all children of the mother to maternal estates,

and will not allow the legitimacy of the child *quoad* the mother, to be questioned. We submit that under these circumstances, the legal presumption of legitimacy, fortified as it is in the present case, ought to be allowed to prevail, leaving the remote relations to assert their pretensions on distribution and upon evidence collected by their own action and at their own expense. (*Peters* vs. *Public Adm.*, 1 *Brad.*, 202.)

IV. Ferrié, even if illegitimate, is entitled to letters under the act of April 18, 1855.

1. No letters can be issued to an alien. They must be granted to Ferrié or to the Public Administrator.

2. The right to administration is an incident of the right of succession; as illegitimates may now succeed, they may administer. (2 *Kent.*, 214.)

3. The saving clause of the statute does not prevent the operation of the principal clause upon the matter now before the Court, for the following reasons.

(*a.*) That saving clause only excepts from the operation of the act " property already vested."

(*b.*) The " property" of which letters of administration are sought is not as yet " vested" in any body.

(*c.*) Upon the decease of Madame Du Lux her personal property became vacant goods, unowned chattels, subject to be disposed of according to the pleasure of the State. (*Public Adm.* vs. *Hughes*, 1 *Brad.*, 128, 130.)

(*d.*) The State had appointed a mode of disposition by distribution among certain persons, and had provided in favor of its appointees certain remedial means by which they could obtain the benefits of the appointment.

(*e.*) But the State might change the appointment and the remedial means, and in so doing would affect no vested right in the property, or in the means, for nothing is vested to which the title is not indefeasible except by act of the party entitled.

(*f.*) It follows that the saving clause does not control or prevent the operation of the principal clause upon property

not reduced to actual possession, or at least ordered to be distributed in ascertained proportions.

(*g.*) The saving of the statute, taken in the strongest sense against the principal clause, is only of " a right or title in or to personal property," visible, tangible, possessible personal property; now no such right can exist in any distributee immediately after death. At first the right of the distributee is only to a distributive share of the money proceeds of personal property, after deducting debts and expenses of administration. The saving clause must be construed strictly as against the general benefit contemplated by the act.

There is no constitutional provision which applies to this case. Even retrospective laws and laws divesting vested rights, unless *ex post facto*, or impairing the obligations of contracts, do not fall within the provision of the constitution of the United States. (1 *Kent*, 409, *Calder* vs. *Bull*, 3 *Dall.*, 386; *Satterlee* vs. *Matthewson*, 2 *Peters*, 413 ; *Watson* vs. *Mercer*, 8 *Peters*, 88.) Here, there is no *ex post facto* law, for it does not concern any crime; (1 *Kent*, 408, *Fletcher* vs. *Peck*, 6 *Cranch*, 138 ;) nor any law impairing the obligation of a contract, for there is no contract to be operated upon.

V. On the whole, we submit that Ferrié is now clearly entitled to letters of administration as the legitimate son of Madame Du Lux, which ought not to be denied him; and that a commission to take further testimony is unnecessary, and ought not to be issued, and that whatever ground for hesitation may have existed upon the former hearing, that ground is now removed by the changed aspects of the case, and by the act of April, under which Ferrié is entitled to letters, even if illegitimate.

VI. The statement made in behalf of the French Consul, that the ordinary commission of this Court cannot be executed in France, and his application for a commission in a special form, which if issued, would commit every thing to the discretion of French tribunals, form an additional reason why

letters should be granted as the existing evidence requires, leaving all claimants to make out independently, and for themselves, whatever title they may be able to assert.

Certainly no commission should issue which will not be allowed to be executed.

And certainly no commission should be issued, the effect of which would be to remit a question here between foreign claimants and the son of the deceased, to foreign tribunals.

P. B. SWEENY, *Public Administrator, in person.*

I. The act of the Legislature upon which Ferrié now moves for administration gives a mere right of inheritance, and does not confer upon illegitimates the right to administration.

1. The right to administer is not given in terms, nor is the statute in regard to administration in any manner altered.

2. The act in question being in derogation of the Common Law, and the long settled statute law and policy of this state to the time of its adoption, and introducing a new and radical doctrine liable to be abused and made to serve the ends of fraud, it should be strictly construed, and the limit which is to be found in the restricted language of the act, must be deemed to have been intended by the Legislature.

3. The claim allowed in this act to an illegitimate is of doubtful public policy; providing for legal consequences from illegal acts, it cannot be tested by the ordinary rules which would apply to a legitimate claim, and it was obviously the intention of the Legislature to leave the claim for examination and adjudication on distribution.

The application for administration is *ex parte,* and in many instances when the parties whose interest it would be to contest the claim reside abroad, would operate virtually to prevent investigation, and to settle the claim without any proof but the unsupported allegation of the petitioner.

4. The view contended for in this point has been practically determined by the Legislature, in the act of the Legislature, passed in 1845, in the matter of *Emma Hughes,* and

although in effect the right to inherit as if legitimate was given to Peters and Hughes in that case, yet the Legislature deemed it necessary to legislate expressly upon the subject of administration, and in that case declared that administration should be granted to the children.

The necessary implication is that if the right to administer had not been expressly given, it could not have been granted, the rules in regard to administration not being affected by the grant from the state, of the right to inherit.

In that case the claim had been previously adjudicated, and all the facts were before the Legislature, and it clearly appeared that there were no next of kin whose claim could be prejudiced by administration.

II. Assuming that administration may be granted to an illegitimate under the act in question, the application for administration must be founded on a petition setting forth the grounds of the application ;—it must be distinctly claimed that the petitioner is the illegitimate son, and it must be alleged that no rights have vested as provided in the act.

Here there is no petition, and no allegations which can be the ground of a decision, or which can be put in issue, while there is on file a petition in which he claims in another and inconsistent capacity.

III. The rights of the next of kin to the distributive proportion of the personal property of an intestate, vest upon the death of the intestate, as absolutely as the rights of a legatee under a will where the time of payment is postponed.

The statute of distributions stands in the place of a will and the rights acquired by it are of the same nature. (2 *Blackstone*, 490.)

" The cases establish the principle that contingent and executory interests, though they do not vest in possession, may vest in right."—*Dayton's Surrogate*, 141, *and cases cited.*

The Legislature, in the act of April 18, 1855, in providing that its provisions should not affect the vested rights of kin to

personal property, intended to guard the rights of distribution which the statute confers, and it was not essential to the protection of those rights that the kin should be in possession of the property. Real estate, by operation of law descends and vests in the heirs immediately on the death of the ancestor, (2 *R. S.*, 157,) and the act in question evidently assumes that the rights to personal property are of the same nature, placing them in the same category, and providing for them in the same language.

In the case of *Rose and others, appellants,* vs. *Clark, administrator, respondent,* 8 *Paige,* 573, the question was expressly raised as to whether rights to personal property vest in the next of kin before distribution. (*See cases cited by counsel on the argument of that case.*) The Chancellor decided that the rights vested in the next of kin, so that if they died before the year, their executor or administrator would become entitled to the distributive share. This authority is conclusive upon the point, and as the cases bearing upon the question are there cited, it is not necessary to quote them here.

IV. The point being established that if there were next of kin living at the death of the intestate, they became vested with the right to her personal property according to the rules of distribution established by our statute, the *onus* of proving that there are no next of kin rests upon Ferrié, who claims only in virtue of such being the fact. Counsel appear who claim to represent next of kin in whom the right to the personalty has vested,—they are entitled to an investigation of the issue they thus present. And this issue cannot be determined unless the commission issue to the place where the facts can be ascertained.

V. The commission ought to issue to ascertain the facts as to the claim of Ferrié as legitimate, as well as to determine the issues which arise under the act of April 18, 1855.

As to the right claimed by the French Consul, the following points are taken:

FERRIE *vs.* THE PUBLIC ADMINISTRATOR.

1. That a foreign consul is a mere commercial agent, representing in the country in which he is recognized, the interests of the country he represents.  (1 *Kent's Com.*, 49.)

2. The intestate, being a citizen of the United States at the time of her death, the French Consul is not entitled to notice under § 29 of 2 *R. S.*, 307, which provides for the only case in which he is entitled to notice.

3. The consul claims that he is a party in this matter, on the presumption that there are subjects of his country interested in the question at issue.  As the deceased owed no allegiance to France, and by naturalization acquired the same legal *status* as any other citizen, the necessary legal effect of his claim is, that he is entitled to notice in all cases of intestacy, there being no distinction between classes of citizens, arising from the place of birth.

4. It is against the policy of this state, as appears from the statutes cited, that foreign-consuls shall be permitted to interfere in the administration even of intestates who may be citizens or subjects of the country from which the consul is commissioned, and the law has provided the office of public administrator for the purpose of intervening in all cases, as well of our own citizens as of foreigners, for the administration of intestate estates, and it makes no distinction as to persons, in the rules by which he shall be governed.

5. If it should appear in this case, that there are interests of subjects of France requiring to be represented, then it is conceded that he may appear for the protection of those interests—but subject to the laws of this state.  In this case there can be no occasion or opportunity to appear in this view of the question until distribution, and there is no evidence presented yet, that there are any rights to the estate of the intestate vested in any such subject.

He cannot claim administration in virtue of his consular relation, and the grant of letters of administration to the public administrator does not invalidate or affect any rights of kin.

6. This question is important in its bearing upon the ques-

tion of costs, because if the consul is a proper party, he is entitled to be paid his costs as such, and it ought not to be allowed unless the right is clear, as it will be establishing a precedent for future cases which will entail unnecessary and burdensome expenses on estates.

JAY & WHITEHEAD, *for French Consul.*

I. An ordinary commission in this case, to be addressed by the Surrogate to one or more individuals, directing them to take the testimony in France of witnesses there residing, will not be recognized nor in any manner assisted by the courts or other authorities of that country. Its execution may perhaps be prevented by them on the ground that it is against the policy and the practice of the government to permit within their borders the exercise of any foreign judicial authority whatever.

If the execution of the commission be not interfered with, the end proposed by its issue could be but partially accomplished. The testimony of none but voluntary witnesses could be taken under it. No compulsory process could be resorted to ; no searching scrutiny into the mysteries of this case could be instituted, and the return of the commission might only involve the question, " who are the right heirs ?" in additional obscurity, and prevent this Court from making a distribution of the estate with a reasonable certainty that they were doing no injustice.

It would seem, therefore, impolitic, and not in accordance with the dignity and respect of this Court, that a commission should issue by its authority in a form that is likely to fail in its purposes, and subject to the probable chance of being treated with disobedience and contempt, both by the individuals whose testimony it seeks to obtain, and by the authorities of the country in which it is to be executed.

The experience of the United States Circuit Court of Pennsylvania in the case of *Nelson et al.* vs. *The United States,* 1 *Peter C. C. R.*, 236, note *a*, is conclusive upon this point.

See also remarks of Duer, Justice, on the subject of Letters Rogatory, in matter of petition of *Jay & Clerke*, 5 *Sandford R.*, 674.

II The *Commission Rogatoire* or Letters Rogatory, is the proper and established mode for the procurance of testimony in foreign countries, recognized not only by our own Courts, but by those of France, who constantly address such commissions to the judicial tribunals of the United States. It is a form of commission likely to be responded to cheerfully, promptly, and effectually, the more especially in this case, where it is issued for the benefit of supposed French heirs—a circumstance calculated to induce more than ordinary interest in its execution.

Another strong reason why the evidence required in this case can be properly procured only by judicial officers of France, arises from the fact that the issue who are the heirs of Madame Du Lux, involves questions solvable only by intimate familiarity with law dependant upon the existing statutes and custom of France, in regard to marriage on a given day during a period when the political aspect of the country, its code and its routine were being rapidly changed by successive revolutions.

THE SURROGATE.—In the month of March last, I directed a commission to issue in this case "for the purpose of instituting the proper inquiries to ascertain the relationship of Ferrié with the decedent." As the evidence then stood, if it had been apparent that no further information could be procured, I would have been compelled to come to some conclusion as to the claim of the applicant, upon the presumptions of law arising out of the facts as then indicated. The testimony however was peculiar in being drawn entirely from documents and letters, and from witnesses acquainted with the decedent only during her residence in this city; and it was highly probable, to say the least, that on resorting to the theatre of the transactions in France, the questions of the legiti-

macy of Ferrié, and his relationship to the decedent might be determined with certainty.    Mde. Du Lux had for forty years in all her correspondence termed Ferrié her nephew, and the proofs here were not so positive as utterly to exclude the possibility of establishing that relationship on closer investigation.    It often happens in a case depending upon circumstantial evidence, that a single new fact furnishes the key to the solution of what was before mysterious, serves to reconcile apparent contradictions, and dissipates every doubt; and it would seem altogether premature to pronounce judgment upon a state of facts far from affording clear and satisfactory light, in the very face of a strong probability that further proofs could be procured.    Nor was I insensible to the circumstance, that at the place of the decedent's alleged marriage and of Ferrié's birth, no investigations appeared to have been made, and that field had been left entirely unexplored.    For these reasons I directed a commission to be issued.    Meanwhile the Legislature of this State has passed an act, which is supposed to vary the *status* of Ferrié.    The law reads as follows : " Illegitimate children, in default of lawful issue, may inherit real and personal property from their mother, as if legitimate ; but nothing in this act shall affect any right or title in or to any real or personal property already vested in the lawful heirs of any person heretofore deceased."

1. The first point made is, that by this new legislation the policy of the State has been changed, and no longer leads to the exclusion of illegitimates from sharing in the estate of the mother, in default of lawful issue.    My answer is, that this may very well be, so far as relates to the *distribution* of the estate, without affecting the right to *administration*, which in default of *lawful* kin, belongs by law to creditors, or the public administrator.    In the case of Emma Hughes, an illegitimate, the State of New York by an act of the legislature, granted all its interest in the decedent's estate to her brothers and sisters ; and their propinquity being a matter of fact, uncontroverted, the law went on to direct the Surrogate to grant letters of administration to the brothers and sisters,

some or one of them. The act under which Ferrié now claims, does not in terms interfere with the ordinary course of administration, and this omission would appear not to be without some reason. Undoubtedly the general rule of the Ecclesiastical law, makes the grant of the administration to follow the interest, and our statute is based on that principle; but an illegitimate does not come within the letter of the statute, and his claim must therefore be advanced as an appeal to judicial discretion. Illegitimate descent is not ordinarily ascertainable with so much certainty as lawful descent; and the policy may well be doubted of granting letters of administration *ex parte* to persons claiming as natural children, and alleging a default of lawful issue. This law is a general law, and I must now construe it so as to establish some definite course of procedure in respect to all future cases. The legislature having failed to disturb the usual order of administration, an illegitimate child has no compulsory claim to the grant of letters. Where in default of lawful issue, the descent of the illegitimate claimant in the first instance is exhibited and proved satisfactorily, it may be proper in the exercise of a sound discretion to make the grant; and on the other hand, if the proofs are not clear, prudence may require the intervention of the public administrator or some other disinterested person, to insure a just scrutiny and the protection of the rights of third parties. I have already declared that I do not consider the proofs of Ferrié's claim satisfactory, in view of the utter neglect to procure evidence from the place of birth and original domicil; though if it should be made to appear that no other testimony can be adduced, I would be compelled to come to a conclusion on the proofs now in.

2. If Ferrié be the illegitimate son of Mde. Du Lux, it is insisted that the act of the legislature has given him the whole estate to the exclusion of her next of kin. The proposition is about tantamount to a declaration, that after the decease of an intestate, the legislature can change the statute of distributions so as to have a retrospective effect, and can give away the estate in a new direction. Indeed the learned counsel pushed

the point so far, as to claim that even after administration, and at any time before actual distribution, next of kin may be stripped of their rights by legislative power, and their distributive shares be given over to others. There is no doubt that at common law, the goods of an intestate were *bona vacantia*, and were taken in charge by the king as *parens patriæ ;* and from this principle flows the rule, that title in the specific property can only be made through the medium of the officer appointed for that purpose—the administrator. The right of the next of kin to the surplus, after the estate is converted into money and the debts are paid, however it may have originated and grown into custom, was made the subject of legislation by the Statutes 22 and 29 Charles II, the provisions of which acts have been very generally adopted throughout the United States. I recognize entirely the doctrine, that the next of kin have no vested legal right or title to the goods of an intestate, and that they can make title only by means of administration : and I also admit fully the competency of the legislature at any time to alter the statute of distributions prospectively. But the real question is, whether under the statute, on the decease of an intestate, the next of kin have not a vested interest in the distributive shares of the surplus of the estate ? If to-day on the death of an intestate unmarried and without issue, his father has succeeded to his personalty, is that right of succession so far the subject of the legislative will, that to-morrow the father may be deprived of the succession, and it may be given away anywhere, even to strangers, or may be taken by the State for public purposes ? Is this right of succession valuable, substantial—is it vested—can it be sold, transferred, devised—does it descend to the next of kin ? All these questions must be answered affirmatively. That the right to a distributive share is not in its nature a title to a specific chattel or thing, must be conceded. But that would be a very narrow criterion of property. In a civilized and commercial community, the most important rights of property exist merely as claims, demands, and obligations. If the idea of property attached merely to physical

things, a vast amount of private wealth would be excluded from the definition. The constitution forbids the deprivation of private property without "due process of law." The entire personal property in the State in the course of a single generation, passes through the course of succession.— Now, by the argument, the owner of a horse cannot be deprived of his property by legislative authority, save by due process of law, and yet, the next of kin entitled to share in an estate worth millions, may be so deprived without due process of law, at any time before actual distribution has been made. I cannot accede to a proposition so subversive of private right, and so repugnant to all established notions of the proper sphere of legislative functions. On the contrary, it seems to me quite clear, that immediately on the decease of an intestate, his next of kin become instantaneously clothed with a vested right to share in the surplus of his personal estate, after the payment of his debts, in due course of administration, notwithstanding the fact that this right cannot be enforced except through the medium of an administrator. This claim to a distributive share cannot by an act of the Legislature be confiscated, or be taken away and granted to another person, and although the law may be changed as to future cases, such a change cannot affect a right of succession already devolved.

3. The general doctrine is that a law must be construed prospectively and not retrospectively. The impropriety of making laws reaching back to the past is so manifest, that a statute will be presumed to relate only to the future, unless there are very express words giving it a retrospective application. Besides, the act in question, whilst declaring that illegitimates, in default of lawful issue, " may inherit real and personal property from their mother, as if legitimate," follows up the provision directly by saying, " but nothing in this act shall affect any right or title in or to any real or personal property already vested in the lawful heirs of any person heretofore deceased." It is said, however, that the saving clause does not reach this case, because personal property

never vests in the *heirs* but only in *the next of kin.* But such a pinched, restricted construction is removed by the previous portion of the act, which says illegitimates may "inherit" personalty, the act itself thus interpreting the words " heir" and " inherit" as applicable to the succession to personal estate.

4. The lawful next of kin of the decedent not being affected by this act, it is apparent that if Ferrié claims as an illegitimate, and if there are any next of kin of Madame Du Lux, the act, as to them, is a pure nullity. They can appear, claim their rights, and, on becoming residents, administer to the estate, and ultimately take, on distribution. This right to distribution and succession, is a right the State has not undertaken to deprive them of, and could not have deprived them of, even by express special legislation, without violating the rights of private property.

5. That the next of kin, in case of Ferrié's illegitimacy, are entitled, is therefore clear, and although from being non-resident aliens, they are disqualified from administering, that disqualification may be removed by a change of residence to New York, and in default of their administering, the Public Administrator in this county is entitled to letters before creditors and strangers. Their alienage, however it affects the mere question of administration, affords no reason for disregarding their claims as to the property. In that respect their standing here is not a matter of comity, but of strict right, and there is no tribunal in any civilized country, I hope, where their rights would not be respected. I must therefore remain of the same opinion, as expressed on the former hearing of this case, and direct a commission to be issued as already determined. That commission must issue, however, in the ordinary form, and should be under the supervision of a person appointed by this Court. The commission *rogatoire*, invoking the aid of foreign tribunals, in the form suggested by the counsel for the French claimants, presents no advantages, and is exposed to the objection that it removes the investigation from the control of this Court, and from the operation of

those rules of evidence which prevail in American tribunals.

The objection made to the right of the French consul to be heard in this case seems to me not well founded. Our treaty with France secures to the consuls of both nations the right to apply " to the authorities of their respective governments, whether federal or local, judicial or executive"...." for the purpose of protecting, informally, the rights and interests of their countrymen, especially in cases of absence." This treaty is a formal recognition of a practice established by national comity. Neither the treaty nor the usage gives the the consul any *status* in the court as a party. He appears only " informally," having a right to be heard not as a party, but as the national agent of parties supposed to be interested.